### UNITED STATES STEEL CORPORATION, Republic Steel Corporation, et al., Plaintiffs,

v.

### UNITED STATES, et al., Defendants,

and

### Companhia Siderurgica Paulista (COSIPA), and Usinas Siderurgicas De Minas Gerais (USIMINAS), Defendants-Intervenors.

Court No. 82–10–01361.

United States Court of International Trade.

July 20, 1983.

Law Department of United States Steel Corporation (Leslie Ranney, Peter Koenig, Atlanta, Ga., of counsel), for plaintiff U.S. Steel Corp.

Cravath, Swaine & Moore, New York City (Joseph R. Sahid, Steven Schulman, New York City, of counsel) for plaintiffs, Republic Steel Corp., Inland Steel Co., Jones & Laughlin Steel Inc., National Steel Corp., and Cyclops Corp.

J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Branch Director, Washington, D.C., Velta A. Melnbrencis, New York City, Francis J. Sailer, Anne W. White, Attys., Commercial Litigation Branch, Civil Div., Dept. of Justice, Washington, D.C., for defendants.

Wald, Harkrader & Ross, William H. Barringer, Arthur J. Lafave III, Washington, D.C., for defendants-intervenors.

WATSON, Judge:

In this phase of the action, plaintiffs seek judicial review of a decision by the International Trade Administration of the Department of Commerce (ITA) to suspend a countervailing duty investigation of carbon plate steel from Brazil.[1]  At the time of its suspension the investigation had preliminarily identified five subsidy programs.[2]

In particular, plaintiffs challenge the agreement between the government of Brazil and the Department of Commerce, which supplied the basis for suspending the investigation, and in which Brazil agreed to offset (by means of an export tax) the amounts determined to be subsidies.[3]

The Court has jurisdiction of the action under 19 U.S.C. § 1516a(a)(2)(A)(i).  Under 19 U.S.C. § 1516a(b) the Court reviews the administrative record and is required to hold unlawful any determination not supported by substantial evidence or not in accordance with the law.

1.  *Carbon Steel Plate From Brazil; Suspension of Investigation,* 47 Fed.Reg. 39,394 (1982).

The investigation was started on February 1, 1982, 47 Fed.Reg. 5,751 (1982).  In March, it was determined to be "extraordinarily complicated" within the meaning of 19 U.S.C. § 1671b(c) and the preliminary determination of whether there was a reasonable basis to believe or suspect that a subsidy was being provided was postponed.  47 Fed.Reg. 11,738 (1982).  In June, a preliminary subsidy determination was made.  47 Fed.Reg. 26,310 (1982).  *See* note 2 *infra.*  Following the suspension challenged in this action, the investigation was continued at plaintiffs' request under section 704(g) (19 U.S.C. § 1671c(g)) and resulted in a final countervailing duty determination (48 Fed.Reg. 2,568 (1983)) which, in accordance with section 704(f)(3) (19 U.S.C. § 1671c(f)(3)), left the suspension of the investigation unaffected and the agreement in force.

2.  The ITA's preliminary determination in June found that Brazil was providing subsidies under three programs, and effective June 17, 1982, the United States Customs Service was directed to suspend liquidation of entries of carbon steel plate from Brazil and to require a cash deposit or bond in the amount of 8.58 percent of the f.o.b. value.  47 Fed.Reg. 26,310 (1982).  Subsequently (in the Notice of Suspension of Investigation) a fourth program was found to be a subsidy, 47 Fed.Reg. 39,394 (1982).  A fifth program (income tax exemption for export earnings) which was placed within the coverage of the suspension, was found to be in existence, but was not used by the producers during the period of the investigation.  48 Fed.Reg. 2,573 (1983).

3.  The agreement was published as *Annex* I to the Notice of Suspension of Investigation, 47 Fed.Reg. 39,395 (1982).

Plaintiffs allege that the ITA did not comply with the notice, consultation, and other procedural requirements of section 704(e), of the Tariff Act of 1930, (19 U.S.C. § 1671c(e)).[4] Plaintiffs also allege that the agreement does not meet the statutory requirements that it offset completely the amount of the net subsidy, that it be effectively monitorable and that it be in the public interest.[5]

After reviewing the record, reading the briefs and hearing oral argument, the Court has not been persuaded that the ITA determination to suspend the investigation was unlawful or lacking in substantial evidence. Stated differently, the Court finds that the terms of the agreement, and the manner in which it was entered into, were in compliance with the statute and support the decision to suspend the investigation.

■ On the procedural question the Court finds that, although things were done in a somewhat rushed manner at the last minute, the timing satisfied the law and, as a practical matter, the parties' procedural rights were not meaningfully affected.

The essentials were satisfied by telephone notifications, and explanations and delivery of copies of the agreement by July 23, 1982, which was no less than 30 days prior to the August 24th issuance of the notice of suspension.[6] The nature of the agreement was such that elaborate explanation was not needed, especially to lawyers whose minds had been developed to an extraordinary keenness by prolonged exposure to the Trade Agreements Act of 1979. In all, it can be fairly stated that no party was prevented from having its say. Although in general the ITA might be wiser to be more generous in the timing and extent of its notification and consultation procedures, the Court cannot say that its conduct was unlawful.

The Court now turns to the agreement which is at the center of this dispute. The agreement provides that the Department of Commerce (the Department) will suspend its countervailing duty investigation on the basis of Brazil's agreement to "offset completely the amount of the net subsidy determined by the Department to exist with respect to the subject product." This is to be done by means of an export tax levied on the exported steel. Brazil agrees not to substitute other benefits for those offset by the agreement and agrees to notify the Department of any changes in benefits to the products involved or in the rate of the export tax or of any decision to alter or

---

4.  19 U.S.C. § 1671c(e)

    (e) *Suspension of investigation procedure.* Before an investigation may be suspended under subsection (b) or (c) the administering authority shall—

    (1) notify the petitioner of, and consult with the petitioner concerning, its intention to suspend the investigation, and notify other parties to the investigation and the Commission not less than 30 days before the date on which it suspends the investigation,

    (2) provide a copy of the proposed agreement to the petitioner at the time of the notification, together with an explanation of how the agreement will be carried out and enforced (including any action required of foreign governments), and of how the agreement will meet the requirements of subsections (b) and (d) or (c) and (d), and

    (3) permit all parties to the investigation to submit comments and information for the record before the date on which notice of suspension of the investigation is published under subsection (f)(1)(A).

5.  The Court has previously held that the standard of review here is whether all of these factors are supported by substantial evidence.

*United States Steel Corp., et al. v. United States,* 4 CIT ——, 557 F.Supp. 590, 82–117 (Dec. 20, 1982). *See* note 8 *infra,* for text of statutory requirements.

6.  A minor difference of opinion has developed between the plaintiffs and defendant-intervenors on the question of what exactly is the date on which the ITA suspends the investigation (no less than thirty days before which the ITA has to notify petitioners and other interested parties of its intent to suspend the investigation, consult with petitioner and supply it with a copy of the proposed agreement and an explanation). For the purpose of allowing the longest possible period for *meaningful* consultation and comment and because the period between the actual issuance of the ITA determination and its publication cannot be considered as receptive to change as the 30 days prior to the issuance, it is better to use the earlier date on which the ITA issues its notice rather than the date of publication. This is taken to conform to the Congressional intent more closely.

terminate its obligations under any of the terms of the agreement. Brazil also agrees to certify at three-month intervals "whether it continues to be in compliance with the agreement by offsetting the net subsidy" and "whether it has substituted any new or equivalent benefits for the benefits offset by the agreement." Brazil further agrees to supply to the Department such information as the Department deems necessary to demonstrate that it is in compliance with the agreement and to permit such verification and data collection as is requested by the Department in order to monitor the agreement. The agreement states that the Department will request information and conduct verification under section 751, (19 U.S.C. § 1675)[7] and that if a determination is made that the agreement has been or is being violated or no longer meets the requirements of sections 704(b) or (d) (19 U.S.C. § 1671c(b) or (d)),[8] then the provisions of section 704(i) (19 U.S.C. § 1671c(i)) shall apply.[9]

In essence, the substantive objections of plaintiffs take the form of a complete rejection of the use of an export tax and the anticipation of both avoidance of the agree-

7. § 1675. *Administrative review of determinations.*
    (a) *Periodic review of amount of duty.*
    (1) *In general.* At least once during each 12-month period beginning on the anniversary of the date of publication of a countervailing duty order under this title [19 U.S.C. §§ 1671 et seq.] or under section 303 of this Act [19 U.S.C. § 1303], an antidumping duty order under this title [19 U.S.C. §§ 1671 et seq.] or a finding under the Antidumping Act, 1921 [19 U.S.C. §§ 160 et seq.], or a notice of the suspension of an investigation, the administering authority, after publication of notice of such review in the Federal Register, shall—
    (A) review and determine the amount of any net subsidy,
    (B) review, and determine (in accordance with paragraph (2)), the amount of any antidumping duty, and
    (C) review the current status of, and compliance with, any agreement by reason of which an investigation was suspended, and review the amount of any net subsidy or margin of sales at less than fair value involved in the agreement, and shall publish the results of such review, together with notice of any duty to be assessed, estimated duty to be deposited or investigation to be resumed in the Federal Register.
    *    *    *    *    *    *

8. § 1671c. *Termination or suspension of investigation*
    *    *    *    *    *    *
    (b) *Agreements to eliminate or offset completely a subsidy or to cease exports of subsidized merchandise.* The administering authority may suspend an investigation if the government of the country in which the subsidy practice is alleged to occur agrees, or exporters who account for substantially all of the imports of the merchandise which is the subject of the investigation agree—
    (1) to eliminate the subsidy completely or to offset completely the amount of the net subsidy, with respect to that merchandise ex-

ported directly or indirectly to the United States, within 6 months after the date on which the investigation is suspended, or
    (2) to cease exports of that merchandise to the United States within 6 months after the date on which the investigation is suspended.
    *    *    *    *    *    *
    (d) *Additional rules and conditions.*
    (1) *Public interest; monitoring.* The administering authority shall not accept an agreement under subsection (b) or (c) unless—
    (A) it is satisfied that suspension of the investigation is in the public interest, and
    (B) effective monitoring of the agreement by the United States is practicable.
    (2) *Exports of merchandise to United States not to increase during interim period.* The administering authority may not accept any agreement under subsection (b) unless that agreement provides a means of ensuring that the quantity of the merchandise covered by that agreement exported to the United States during the period provided for elimination or offset of the subsidy or cessation of exports does not exceed the quantity of such merchandise exported to the United States during the most recent representative period determined by the administering authority.
    *    *    *    *    *    *

9. (i) *Violation of agreement.*
    (1) *In general.* If the administering authority determines that an agreement accepted under subsection (b) or (c) is being, or has been, violated, or no longer meets the requirements of such subsection (other than the requirement, under subsection (c)(1), of elimination of injury) and subsection (d), then, on the date of publication of its determination, it shall—
    (A) suspend liquidation under section 703(d)(1) [19 U.S.C. § 1671b(d)(1)] of unliquidated entries of the merchandise made on or after the later of—
    (i) the date which is 90 days before the date of publication of the notice of suspension of liquidation, or

ment by Brazil and shortcomings in the enforcement of the agreement by the ITA.

█ Plaintiffs argue that because Brazil owns COSIPA and USIMINAS and has a strong national interest in the encouragement of its steel industry, it is an inherently unsuitable custodian of the funds to be generated by the export tax. This argument simply indicates plaintiffs' suspicion that Brazil will try to return the export tax to the taxpayers by any means. To the extent that this argument assumes an evasive intent on the part of Brazil it cannot be entertained. The same argument would doom even the complete termination of the subsidy because the funds would still be in the hands of the Brazilian government and subject to manipulation. The good faith of the parties to these agreements must be accepted. In any event, an agreement cannot be faulted for being avoidable by deception and evasion.

To the extent that this argument relies on a legal objection to the use of export-tax offsets when the exporter is owned by the government, the argument is not supported by the law. The language of the statute does not make that distinction, the legislative history does not suggest it, and the force of logic does not require it. The law respects the separation of corporations from their stockholders unless there is good rea-

son to find otherwise. In this context, reason means factual support, not motive alone. The genuineness of the separation between the corporation and the government stockholder and the bona fides of transactions between them is for the ITA to decide. Those decisions will be upheld unless they are lacking in substantial evidence or legally deficient.

There is no doubt that if an export tax had been in place prior to the investigation, the offset would have reduced the amount of the gross subsidy. That would have been the result of the application of section 771(6)(C) (19 U.S.C. § 1677(6)(C)) in which export taxes specifically intended to offset the subsidy received are listed as deductions.[10] It is therefore difficult to comprehend why such offsets should not figure prominently among the offsets which justify suspension of the investigation under section 704(b) (19 U.S.C. § 1675(b)).

Finally, the existence of state-owned corporations in free market economies is too well known to believe that Congress intended special treatment for them without mentioning it, specifically to preclude the use of offsets. Congress was not hesitant to provide differential treatment for special situations involving multinational corporations and enterprises operating in state-controlled economies under the Antidumping

---

(ii) the date on which the merchandise, the sale or export to the United States of which was in violation of the agreement, or under an agreement which no longer meets the requirements of subsections (b) and (d) or (c) and (d), was first entered, or withdrawn from warehouse, for consumption,

(B) if the investigation was not completed, resume the investigation as if its affirmative preliminary determination under section 703(b) [19 U.S.C. § 1671b(b)] were made on the date of its determination under this paragraph,

(C) if the investigation was completed under subsection (g), issue a countervailing duty order under section 706(a) [19 U.S.C. § 1671e(a)] effective with respect to entries of merchandise the liquidation of which was suspended, and

(D) notify the petitioner, interested parties who are or were parties to the investigation, and the Commission of its action under this paragraph.

(2) *Intentional violation to be punished by civil penalty.* Any person who intentionally

violates an agreement accepted by the administering authority under subsection (b) or (c) shall be subject to a civil penalty assessed in the same amount, in the same manner, and under the same procedure, as the penalty imposed for a fraudulent violation of section 592(a) of this Act [19 U.S.C. § 1592(a)].

**10.** 19 U.S.C. § 1677

(6) *Net subsidy.* For the purpose of determining the net subsidy, the administering authority may subtract from the gross subsidy the amount of—

(A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the subsidy,

(B) any loss in the value of the subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and

(C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the subsidy received.

Act of 1921, as amended, 19 U.S.C. § 1677b(c) and (d). In sum, we do not have here a self-evident flaw or definite anomaly in the law which has to be interpreted away by reference to a larger and overriding measure of Congressional intention.

Plaintiffs also complain that the agreement does nothing to prevent the return of the export tax to these companies by means of equity infusions, i.e., government purchases of stock. Plaintiffs point out that the ITA has already determined in this investigation that certain equity infusions were not subsidies.[11] Nevertheless, it still remains within the authority of the ITA to find, under this agreement, that future infusions have the practical effect of providing a benefit which substitutes for the subsidies offset by the agreement.[12] This involves the provision in the agreement in which Brazil agrees not to provide substitute benefits and leads into a discussion of plaintiffs' related objections.

Plaintiffs have fixed on the ban on "substitute" benefits as a sign of the agreement's failure to accomplish the statutory objectives because it does not reach all "new" subsidies and involves the ITA in impossible detection and determination of the intent of future benefits.

When the agreement states its coverage of "substitute" subsidies it goes exactly as far as it has to go under the law, and probably as far as it can go. If the agreement purported to bar all future subsidies it might be an unjustified interference with the right of a country to subsidize, which is recognized in the Agreement on Interpretation and Application of Articles VI, XVI, and XXXIII of the General Agreement on Tariffs and Trade (Relating to Subsidies and Countervailing Measures), approved under section 2(a) of the Trade Agreements Act of 1979 (19 U.S.C. § 2503(a)).

When the agreement speaks to substitute subsidies, it must refer to those later benefits which have the practical effect of re-storing offset subsidies in whole or in part. Lack of intent to substitute is irrelevant, so plaintiffs' concern with the agency necessarily becoming involved in the intricacies of determining intent is excessive. The decision as to what is or is not a substitute is for the ITA to make and, while it is impossible to predict all the factors which may enter into such a decision, it is safe to say that the agreement insures that the ITA will have sufficient data to make an informed decision.

Plaintiffs' further concern that the agency will not be able to detect benefits which Brazil does not report is not a defect of monitoring. That would be a plain violation of the agreement which is not to be assumed. In addition, the ITA's general investigatory powers have to be considered sufficient to find such violations, if they occur, and respond appropriately. The provisions for monitoring are sufficient to allow the ITA to receive or demand all the information it needs to perform its duties and the proper performance of those duties is presumed.

Plaintiffs have forcefully conveyed their lawyerly premonitions of disaster. They have presented a number of scenarios in which various substituted or increased benefits escape being offset even when the ITA is informed about them. According to plaintiffs, it is possible for Brazil to anticipate the offset much as a donor can anticipate a gift tax and include it in the gift. In the opinion of the Court, the normal and proper operation of this agreement will not permit such or similar avoidances because the export tax does not remain a predictable constant. It must be adjusted promptly and accurately to reflect changes in benefits. Under the agreement, the ITA should have the information needed to accomplish adjustment and the agreement contemplates that it will be done expeditiously.

Beyond all this, if disputes arise as to whether certain benefits are substitutes for offset subsidies or whether the export tax is

---

11. That determination is under judicial review in another phase of this action.

12. In the final determination referred to in note 1 *supra*, the rebate of a value-added tax under Decree Law 1547, which eventually enlarged the government's equity share of the producers, was found to be a subsidy. 48 Fed.Reg. at 2,570 (1983).

being properly adjusted, the possibility of judicial review may be foreseen in appropriate circumstances.

The Court also holds that there was substantial evidence to find that the suspension of this investigation was in the public interest. This can be expected to be the norm if the agreement satisfies the statutory criteria and no other important considerations have been overlooked.

In sum, the Court is of the opinion that this agreement cannot be avoided short of outright deception, incompetence or unlawful conduct—none of which can be assumed, and all of which are likely to be remediable administratively or judicially. The agreement leaves plaintiffs as secure as they can be in a changing world.

For these reasons, the Court finds that there was substantial evidence for the ITA's determination to suspend its investigation of carbon steel plate from Brazil. Its conduct was lawful and the agreement it entered into complied with the requirements of the law. Accordingly, the ITA's determination to suspend the investigation is affirmed.

**Highveld Limited, Companhia Siderurgica Paulista (COSIPA), and Usinas Siderurgicas De Minas Gerais (USIMINAS), Defendants-Intervenors.**